RICHARDS *v.* TAYLOR.

4-6269 · 150 S. W. 2d 32

Opinion delivered April 7, 1941.

*Triplett & Williamson,* for appellant.

*Maurice L. Reinberger* and *E. D. Dupree, Jr.,* for appellee.

HUMPHREYS, J. In January, 1940, appellant brought suit against appellees in the chancery court of Jefferson county for the custody of Shirley Richards.

Appellant is the father of Shirley, who is now about six years of age and appellee, J. E. Taylor, was the uncle of Shirley's mother, Mrs. Pansy Graves, and is the great uncle of Shirley.

Appellees took Shirley's mother into their home and reared her until she married John Mays of Clarksdale, Mississippi, in 1927. The young couple went to Clarksdale, Mississippi, to live, where a child was born to them. They separated after the birth of the child and the child was given to and adopted by John Mays' sister. A divorce was granted one or the other of them, whereupon appellees went to Clarksdale to get Shirley's mother and on the way back all agreed for Shirley's mother, then Mrs. Mays, to go to Dallas, Texas, and make her home with Mrs. Wagner, a sister of appellee, J. E. Taylor. They bought a ticket for her and wired Mrs. Wagner

she was coming to live with her. Mrs. Wagner took her into her home as a member of her family and she lived with Mrs. Wagner about six months and then married appellant. They lived together for about two years during which time Shirley was born to them. A short time after Shirley's birth they separated and appellant left them with his mother and two sisters and went to Colorado in search for work where he remained between two and three months. After returning he and his wife agreed to disagree and his wife brought a suit for a divorce and obtained same, but, by her consent, the custody of the child was awarded to appellant. Some time after the divorce he took Shirley to New Orleans where he kept her in a boarding house until he returned to Dallas which covered a period of about six or eight months. In the meantime Shirley's mother married Mr. Dallas Sims who was earning a salary of $400 a month. Mr. Dallas Sims had a home and was a man of some means. After the marriage, Mrs. Sims concluded she wanted Shirley back and went to New Orleans and made an effort to get him to agree to return Shirley to her, but appellant refused to let Mrs. Sims have her. In a short time appellant brought Shirley back to Dallas and appellant's family persuaded him to let Mrs. Sims have Shirley. The argument advanced by them was that Mr. Dallas Sims was a man of means, earning a good salary and was able and willing to support, maintain and educate Shirley. During the time the matter was being considered Mr. Dallas Sims gave appellant a check for $300 and his testimony is to the effect that he gave it to him for the surrender of the custody and control of Shirley to Mrs. Sims. On the day he gave the check to appellant an order was made by the court awarding the custody of Shirley to Mrs. Sims. A short time after getting the check, a Mrs. Etta Mae Jackson testified that she had a conversation with appellant in which he stated he had sold his child, Shirley. Appellant denied making the statement or that he had sold Shirley for $300 claiming in his testimony that he used the money to pay debts incurred by Mrs. Sims while she was living with him as

his wife and that he returned $50 to Mrs. Sims and only used $1 out of the check for his own benefit.

Later appellant enlisted in the army for a period of three years and is still in the army. When he first enlisted, he got $21 a month in addition to his board, clothing, etc., but later got $40. During his entire service in the army he never contributed or offered to contribute anything toward the support of Shirley. He made little effort during the time of his enlistment to keep in touch with Shirley or the Sims. Shirley was supported by Mr. Sims for quite a while and for some reason not disclosed by this record Mrs. Sims took French leave of Mr. Sims taking Shirley with her. She did not leave her address, but later it was ascertained that she had gone back to Clarksdale, Mississippi. The Sims were divorced and Shirley's mother married John Mays to whom she was married the first time and Shirley was taken into their home and resided there until Shirley's mother died. Shirley's mother was ill for about ten months. During that time appellees visited the Mays and Mrs. Mays requested them to take the child after she passed away and rear her in their home where she herself had been reared. After the death of Mrs. Mays, John Mays brought Shirley to appellees' home in compliance with Mrs. Mays' dying request and that is where Shirley now is. After Shirley's mother ran away from home and married John Mays appellees sent her considerable money whenever she happened to be in need and took an interest in her as much so as if she had been their own daughter.

The appellees are good people, able and willing to support, maintain and educate Shirley. They have a comfortable home, no dependents and can give her every care and attention she will need. Appellee, J. E. Taylor, as heretofore stated, is Shirley's great uncle and reared Shirley's mother. Appellant's people, including his father and mother, are also good people. His father and mother separated and they have a divorce and his father is married again, but the mother and his two sisters reside together. His mother has no separate estate of

her own. Her daughters have employment and perhaps between them all they could support, maintain and educate Shirley, and are willing to do so.

Appellant enlisted in the army April 7, 1937, at $21 a month. His salary was raised to $30 around September or October, 1937, and was raised to $42, January 14, 1938. These amounts were paid him in addition to his board, clothing, etc. During the period of his services in the army he never contributed anything toward Shirley's support. He testified that he had completed a course in radio work in the army and has received a commission as staff sergeant which will pay him around $125 a month in addition to his board, clothes, hospital, doctor and dentist bills; that if the custody of Shirley is awarded to him, this will enable him to support and maintain her. When asked what his plans are for taking care of the child if the custody is awarded to him he answered that until he is permanently located he has made arrangements with his mother to take care of his child for him where she lives in Dallas, Texas; that he knows for certain that he will be located for a time in New Jersey and that after that he is not certain where he will be located; that his intention is to remain in the army; that Shirley was with his mother from the 21st of February until September or October, 1935, and again for a while in 1936. He also testified that during his services in the army he took out a $3,000 policy of insurance in favor of his sister, but with the understanding that if anything happened to him she would use it to take care of Shirley.

The record reflects that during Shirley's entire life she has lived in one family or another, but at no time a sufficient length of time for strong ties of affection and love to form between those with whom she lived and herself. Dallas Sims testified that perhaps he loved Shirley more than anyone else connected with the suit. Including the $300 he paid appellant, Sims has perhaps expended more on Shirley than anyone else. Appellant has expended practically nothing toward her support and maintenance and none of his immediate relatives have contributed very much toward her support. Shirley's mother

married four times, two times to the same husband. In fact her life was filled up largely with marriages and divorces. She was the one who had clung pretty closely to Shirley during all her troubles and vicissitudes and she must have had great love for her and she made a deathbed request that Shirley be reared in the home of appellees. Of course her request is not controlling, but, to say the least of it, it is appealing and is the voice of her mother who has passed on in behalf of the welfare of her child.

The evidence in the case is very voluminous covering the lives of the immediate relatives of Shirley on the paternal and maternal sides, and their ability to provide for her welfare, and, after hearing it all, the chancellor concluded and said that appellant had abandoned his child, Shirley Janice Richards, and had forfeited the right to have the care and custody of the child and that as between the parties it would be to the best interest of Shirley that the custody thereof should be awarded to appellees with permission to appellant to visit his child at all reasonable times and rendering a decree dismissing appellant's petition for *habeas corpus*.

The late Chief Justice HART in the case of *Kirk* v. *Jones,* 178 Ark. 583, 12 S. W. 2d 879, said: ''Minors are the wards of chancery courts, and it is the duty of such courts to make any orders that would properly safeguard their rights. This is a *habeas corpus* proceeding, and the court had the authority to grant the custody of the child to the aunt, provided it finds that the father had forfeited his rights thereto. Three parties are interested in the custody of minor children, the state, the parents, and the child itself. While the right of the father to the custody of his child is paramount this is denied in many cases and, regard being had for the welfare of the child, its custody has been placed elsewhere. *Verser* v. *Ford,* 37 Ark. 27; *Washaw* v. *Gimble,* 50 Ark. 351, 7 S. W. 389; *Coulter* v. *Sypert,* 78 Ark. 193, 95 S. W. 457; and *Clark* v. *White,* 102 Ark. 93, 143 S. W. 587, Ann. Cas. 1914A, 739.

"The permanent well being of the child more than its present enjoyment is to be considered as of prime importance. No hard and fast rule can be laid down on the subject, and each case must be governed to a large extent by its own particular facts."

Tested by the rule announced in *Kirk* v. *Jones, supra,* we are of the opinion that the welfare of Shirley will be best subserved by affirming the decree of the chancellor.

The chancery court, having retained jurisdiction, may make such orders in respect to visitations by relatives of Shirley Taylor as, in its discretion, are proper.

The decree is, therefore, affirmed.